# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

| | |
|---|---|
| WILLIAM K. DIXON, *Prisoner Identification No. 312-160*,<br><br>Plaintiff,<br><br>v.<br><br>KARLA HILL-PEAY, *CCMS II*,[1]<br>JEFFREY NINES, *Assistant Warden*,<br>KEVIN LAMP, *Chaplain*,<br>LIEUTENANT GREGORY FORNEY, and<br>CO II SOWS,<br><br>Defendants. | Civil Action No. TDC-18-1023 |

## MEMORANDUM OPINION

Plaintiff William K. Dixon, an inmate incarcerated at the North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, has filed a civil rights complaint under 42 U.S.C. § 1983 alleging that violations of his rights under the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution when he was denied access to religious services, accused of attempting to bribe a prison chaplain in exchange for withdrawing a grievance relating to that alleged denial, and unfairly punished with disciplinary segregation. Defendants Jeffrey Nines, Assistant Warden of NBCI; Lt. Gregory Forney; and NBCI Chaplain Kevin Lamp (collectively, "Defendants") have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. Dixon responded by filed a Motion for Summary Judgment, which the Court construes as both a Motion and a memorandum in opposition to Defendants' Motion. Having

---

[1] The Clerk shall amend the docket to reflect Defendants' full and complete names and job titles, as reflected in this caption.

reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, will be granted, and Dixon's Motion for Summary Judgment will be denied.

## BACKGROUND

In his unverified Complaint, Dixon alleges that on March 4, 2017, he was not able to attend a Seventh Day Adventist ("SDA") religious service when his cell door did not open to allow him to leave and attend the service. As of that date, Dixon was listed in NBCI records as having SDA as his religious preference. However, his preference had changed over time. At Patuxent Institution, where Dixon was incarcerated until February 2016, he had listed his religious preference as Moorish Science Temple of America ("MSTA"). After arriving at NBCI in February 2016, Dixon switched his religious preference to SDA. On February 13, 2016, Dixon was released from his cell to attend an SDA religious service but went to the wrong location and was thus unable to attend. Between February 2016 and March 2017, Dixon was held in administrative segregation for significant stretches of time, during which, under NBCI policy, he and other inmates on segregation were not permitted to attend religious services and were instead supposed to worship in their own cells.

On February 23, 2017, Dixon submitted a written request to change his religious preference to MSTA. On March 2, 2017, Chaplain Lamp responded in writing, noting that Dixon was presently listed as SDA and stating that if Dixon wanted to change religious groups, he needed to complete a form enclosed with the response.

On March 4, 2017, when Dixon's cell door did not open so he was not able to attend an SDA service, Dixon asked correctional officers why he was not released for religious services. He

2

was told that the chaplain was responsible for determining which religious services an inmate would be permitted to attend.

On March 13, 2017, Dixon filed an Administrative Remedy Procedure grievance ("ARP") complaining about the denial of access to religious services. According to Lamp, on March 29, 2017, while he was interviewing Dixon about his ARP, Dixon offered to withdraw his ARP if Lamp would pay him five dollars. Lamp then reported Dixon for attempting to bribe a correctional officer. In contrast, Dixon claims that Lamp had tried to get him to withdraw the ARP in exchange for Lamp agreeing to change Dixon's religious preference to MSTA, which Dixon had "preferred for months." Pl.'s Mot. Summ. J. at 7, ECF No. 15-1. Dixon refused to withdraw the ARP without any monetary compensation. Dixon asked for $5,000, which was the amount that he was seeking through the ARP.

On April 2, 2017, Acting Warden Nines denied the ARP on the grounds that an NBCI investigation had concluded that Dixon's cell had been opened to allow him to attend the service, but he chose not to do so, and that Dixon had tried to bribe Lamp.

Dixon was placed on administrative segregation, which he asserts was actually disciplinary segregation. On April 25, 2017, a disciplinary hearing was conducted. The witnesses were Dixon, Lamp, and a correctional officer who corroborated Lamp. The hearing officer found that Dixon had tried to bribe Lamp and imposed 60 days of cell restriction upon Dixon. Where Dixon had already served approximately 30 days in disciplinary segregation in advance of the hearing, dating back to March 29, 2017, he only had to serve approximately 30 more days on cell restriction, until May 27, 2017.

According to Dixon, while in disciplinary segregation, he was denied access to certain personal property, outside recreation, phone privileges, work opportunities, and visitation without

being handcuffed. He contends that received only one hour of recreation per week and was regularly handcuffed. Dixon further alleges that he suffered unspecified physical and emotional injuries as a result. At one point, he reported that he was hearing voices.

On June 9, 2017, approximately three months after that incident, Dixon submitted a form seeking to change his preference to a third religion, Sunni Islam. The change was made on July 10, 2017.

Dixon filed his Complaint in which he alleged that the denial of access to religious services violated his rights under the First Amendment, his punishment for allegedly bribing Lamp violated his right to due process under the Fifth and Fourteenth Amendments, and his placement in disciplinary segregation both before and after his disciplinary hearing constituted cruel and unusual punishment in violation of the Eighth Amendment.

In his Motion for Summary Judgment, Dixon for the first time alleges a claim of retaliation under the First Amendment. In a supplemental brief entitled "Motion for New Evidence Admission," submitted after he filed his Motion for Summary Judgment, Dixon attaches a prison grievance relating to a January 25, 2019 incident in which Correctional Officer Sharon Lipcomb ordered him not to attend a Sunni Islamic religious service. Briefs in opposition to a dispositive motion may not be used to amend a complaint or add new claims. *See Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *Mylan Laboratories, Inc. v. Akzo, N. V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991), *aff'd*, 2 F.3d 56 (4th Cir. 1993). The Court therefore will not consider these additional allegations.

## DISCUSSION

In their Motion, Defendants seek dismissal under Federal Rule of Civil Procedure 12(b)(6) or summary judgment under Rule 56 on the grounds that: (1) Dixon has failed to state a claim or establish a genuine issue of material fact on his constitutional claims; (2) Assistant Warden Nines and Lt. Forney are not liable because there are no allegations that they were personally involved in the events in question and there is no vicarious liability under § 1983; and (3) Defendants are entitled to qualified immunity. In turn, Dixon seeks summary judgment in his favor.

### I.  Legal Standards

Defendants filed their Motion as a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one

for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation and internal quotations omitted).

Here, the notice requirement has been satisfied by the title of Defendants' Motion. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or another filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 245 (4th Cir. 2002). Because Dixon has not filed a Rule 56(d) affidavit or otherwise requested discovery, and in fact seeks summary judgment on his own behalf, the Court will construe the Motion as seeking summary judgment as to arguments requiring consideration of attached exhibits.

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is "genuine" only

if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## II. First Amendment

Dixon alleges that Defendants violated his First Amendment right to free exercise of religion by preventing him from attending religious services. Although Dixon referenced an incident in February 2016 in which he was unable to attend a religious service because he went to the wrong location, in his Motion, Dixon has clarified that his First Amendment claim relates not to that episode, but to the March 4, 2017 incident when he was not permitted to attend an SDA religious service because his cell door was not opened to allow him to leave. Pl.'s Mot. Summ. J. at 2. According to Dixon, at the time he had a request form stating that his religious affiliation was SDA.

"Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* (quoting *Price v. Johnson*, 334 U.S. 266, 285 (1948)). Prison restrictions that affect inmates' religious exercise but are reasonably related to legitimate penological objectives do not run afoul of the Constitution. *See Turner v. Safley*, 482 U.S. 78, 89-91 (1987). To determine whether a prison regulation is reasonable, and therefore constitutional, courts consider four factors:

(1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action.

*Wall v. Wade*, 741 F.3d 492, 499 (4th Cir. 2014) (quoting *Lovelace v. Lee*, 472 F.3d 174, 200 (4th Cir. 2006)).

As a threshold matter, to state a claim for violation of rights under the Free Exercise Clause, Dixon must demonstrate that: (1) he holds a sincere religious belief; and (2) a prison practice or policy places a substantial burden on his ability to practice his religion. *See Wilcox v. Brown*, 877 F.3d 161, 168 (4th Cir. 2017). A substantial burden is placed upon a prisoner's religious exercise when it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* Prison restrictions that impact on the free exercise of religion but are related to legitimate penological objectives do not run afoul of the Constitution. *See Turner*, 482 U.S. at 89-91.

Here, Dixon has not provided evidence of a sincere religious belief. Rather, the record contains evidence that shows a pattern of changing religious affiliation frequently, without explanation. Prior to February 2016, when Dixon was housed at Patuxent Institution, he was listed as having a religious preference for MSTA. Although he was listed as having a religious preference of SDA from February 2016 forward, on February 23, 2017, less than two weeks before the March 4, 2017 incident, Dixon submitted a written request to be designated to attend MTSA services. The chaplain of NBCI received the request and sent him a form to complete in order to make the change, which apparently had not occurred by March 4, 2017. Indeed, Dixon acknowledges that he had "preferred for months" the MSTA religion. Pl.'s Mot. Summ. J. at 7.

8

Then on June 9, 2017, approximately three months after that incident, Dixon submitted a form seeking to change his preference to a third religion, Sunni Islam. The change was made on July 10, 2017. Where Dixon has offered no evidence of a sincere religious belief, and the record instead shows that his expressed interest as of date of the incident was in a different religion, Dixon has not provided a sufficient basis to support a finding of a sincere religious belief. *Wilcox*, 877 F.3d at 168.

For substantially similar reasons, Dixon has failed to provide evidence to show that his inability to attend SDA services on March 4, 2017 placed "a substantial burden on his ability to practice his religion." *Id.* When Dixon was on the list to attend SDA services in October 2016, he did not attend any services and was therefore removed from the list. In the two weeks before the March 4, 2017 incident, Dixon had made a request to attend MTSA services instead of SDA services, and correctional officers told him that the chaplain would have to decide which service he would be permitted to attend. Under these circumstances, Dixon has not created a genuine issue of material fact whether his inability to attend SDA services one occasion in March 2017 substantially burdened his religious practices.

Finally, although Dixon makes reference in the Complaint to other periods of time when he was not allowed to attend religious services, he acknowledged that he was on administrative segregation for various periods of time and that the prison did not allow inmates in such status to attend religious services outside their cells. He has not challenged that practice. Indeed, he was in segregation from February 18, 2016 to May 19, 2016; from June 2, 2016 to September 13, 2016; and from January 31 to February 17, 2017. For other periods of time, he makes no specific claim of a First Amendment violation and offers no specific evidence to show either sincere religious belief or a substantial burden on his religious practice during such unspecified times. The Court

therefore will grant Defendants' Motion and grant summary judgment to Defendants on Dixon's First Amendment free exercise of religion claim. The Court will deny Dixon's Motion as to the First Amendment claim.

**III.   Due Process**

Dixon also claims that he was improperly charged with, found guilty of, and punished for attempting to bribe a correctional officer, in violation of his right to due process of law. Dixon disputes Lamp's account that Dixon had tried to bribe him by offering to withdraw his ARP relating to the March 4, 2017 incident in exchange for five dollars. Rather, he asserts that he was trying to settle his grievance and referenced the fact that he believed that his claim was worth $5,000. Dixon argues that his due process rights were violated when, after a hearing at which Dixon, Lamp, and a correctional officer testified, he was found to have committed the offense and was punished with 60 days of cell restriction.

Prisoners retain rights under the Due Process Clause, but prison disciplinary proceedings are not part of a criminal prosecution, so the full array of rights due to a defendant in such proceedings does not apply. *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). In prison disciplinary proceedings that implicate a possible loss of diminution credits, a prisoner is entitled to certain due process protections which include: (1) advance written notice of the charges against him; (2) a written statement of the evidence relied on and the reasons for taking any disciplinary action; (3) a hearing at which the inmate is afforded the right to call witnesses and present evidence when doing so is not inconsistent with institutional safety and correctional concerns; (4) the opportunity to have non-attorney representation when the inmate is illiterate or the disciplinary hearing involves complex issues; and (5) an impartial decision-maker. *See id.* at 564-571. There is no constitutional right to confront and cross-examine witnesses or to retain and be appointed

counsel. *See Baxter v. Palmigiano*, 425 U.S. 308, 322 (1976); *Brown v. Braxton*, 373 F.3d 501, 504-05 (4th Cir. 2004).

In this instance, Dixon did not receive any sanction consisting of the loss of diminution or good time credits, but instead was sanctioned only with disciplinary segregation. Prisoners have a liberty interest under the Fourteenth Amendment in avoiding confinement conditions only if those conditions impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). In *Sandin*, an inmate who was sentenced to 30 days of disciplinary segregation, served that time, then had the disciplinary decision overturned on appeal, filed a due process claim under 42 U.S.C. § 1983. *Sandin*, 515 U.S. at 476. The Court held that the disciplinary segregation, which did not affect the duration of the prison sentence, did not present the type of deprivation that implicates a constitutional liberty interest giving rise to due process rights. *Id.* at 486. Likewise, the United States Court of Appeals for the Fourth Circuit has held that inmates have no liberty interest in avoiding, and thus no due process claim stemming from, placement in administrative segregation. *Beverati v. Smith*, 120 F.3d 500, 502-04 (4th Cir. 1997) (rejecting a due process claim by inmates held in administrative segregation for six months after disciplinary charges were resolved). Thus, a due process claim relating to placement in administrative or disciplinary segregation can succeed only if the prisoner can show "(1) denial of an 'interest that can arise either from the Constitution itself or from state laws or policies' and that (2) 'this denial imposed on him an atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" *Prieto v. Clarke*, 780 F.3d 245, 251 (4th Cir. 2015) (quoting *Lovelace v. Lee*, 472 F.3d 174, 202 (4th Cir. 2006)).

Although Dixon asserts that he served approximately 30 days in disciplinary segregation before he was found guilty of bribery, he had that time credited to his ultimate punishment of 60 days of cell restriction. Regardless of whether characterized as administrative or disciplinary segregation, Dixon has not asserted facts demonstrating that the conditions he faced were "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin* 515 U.S. at 484. Dixon asserted that he was denied various personal property, phone privileges, work privileges, and normal visitation without being handcuffed. He received recreation once a week for one hour. Although more harsh than those of general population, these alleged conditions may be imposed without due process protections. *See Beverati*, 120 F.3d at 504 (finding that the conditions in segregation were "not so atypical" that they "imposed a significant hardship in relation to the ordinary incidents of prison life even though the inmates claimed that segregation included vermin-infested cells, human waste in cells, leaking toilets, unbearable heat, less food, reduced access to clean clothes and linens, reduced out-of-cell time, no outdoor recreation time, and no educational or religious services).

Even if the conditions faced by Dixon met this standard necessitating due process protections before their imposition, Dixon's due process claim fails because he does not allege and provides no evidence to support a claim that he did not receive the requisite procedural protections. *See Wolff*, 418 U.S. at 564-71. Moreover, if these procedural protections are provided, substantive due process requires only that "some evidence supports the decision by the prison disciplinary board." *Superintendent, Mass. Correctional Inst. v. Hill*, 472 U.S. 445, 455 (1985). This standard is met if "there was some evidence from which the conclusion of the administrative tribunal could be deduced." *Id.* (quoting *United States ex rel. Vajtauer v. Comm'r of Immigration*, 273 U.S. 103, 106 (1927)). Here, the hearing record reflects that Lamp testified that Dixon tried to bribe him,

such that there was "some evidence" to support the finding of bribery. *Hill*, 472 U.S. at 455. Dixon's due process claim therefore fails. Defendants' Motion will be granted as to this claim. Dixon's Motion will be denied on this claim.

## IV. Eighth Amendment

Beyond his due process claim, Dixon also argues that the conditions of confinement while he was in disciplinary segregation, both before the hearing and after he was sentenced to 60 days of cell restriction, amounted to cruel and unusual punishment in violation of the Eighth Amendment. The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)). Conditions of confinement that "involve wanton and unnecessary infliction of pain," or which "deprive inmates of the minimal civilized measure of life's necessities," may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions that are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society." *Id.*

In order to establish the imposition of cruel and unusual punishment in conditions of confinement, a prisoner must prove two elements: that "the deprivation of [a] basic human need was *objectively* sufficiently serious, and that *subjectively* the officials act[ed] with a sufficiently culpable state of mind." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko*, 535 F.3d at 238 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298–300 (1991)).

The objective prong of a conditions of confinement claim requires the prisoner to "'produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions,' or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions." *Shakka*, 71 F.3d at 166 (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)). To establish a sufficiently culpable state of mind, there must be evidence of deliberate indifference, in that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson v. Seiter*, 501 U.S. 294, 298–300 (1991) (applying the deliberate indifference standard to conditions of confinement claims). "[T]he test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

In his Motion for Summary Judgment, Dixon generally claims that as a result of his disciplinary segregation for one month, he had a depressed mental state, and that his lack of sufficient recreation resulted in unspecified physical and emotional injury. Dixon's unverified allegations and limited evidence do not establish an objectively serious deprivation of human needs from the conditions of confinement, particularly where they were limited to a 30-day period. *See In re Long Term Administrative Segregation of Inmates Designated as Five Percenters ("Five Percenters")*, 174 F.3d 464, 471-72 (4th Cir. 1999) (holding that inmates held in segregation for over three years while confined to cells for 23 hours per day, without access to work, study, or school programs, and with only five hours of recreation per week did not amount to cruel and unusual punishment); *Pearson v. Ramos*, 237 F.3d 881, 885-86 (7th Cir. 2001) (holding that a 360-day denial of outdoor recreation was not an Eighth Amendment violation where it resulted from four consecutive 90-day sanctions for four separate and severe institutional violations).

14

The limited evidence of emotional injury is likewise insufficient. *See Five Percenters*, 174 F.3d at 472 (holding that "depressed mental state, without more, does not rise to the level of a serious or significant physical or emotional injury"). Even if the undated, unsigned sick call request form submitted by Dixon, on which he claimed to be hearing voices, could be deemed sufficient to establish a serious emotional injury, there are no facts from which this Court could find that Defendants possessed a sufficiently culpable state of mind amounting to deliberate indifference to Dixon's health or safety. *See Williams v. Branker*, 462 F. App'x 348, 350, 355 (4th Cir. 2012) (finding no Eighth Amendment violation from conditions including only one hour of out-of-cell time on five days in a week and a lack of outdoor recreation for "several years," including because of the lack of evidence of subjective knowledge of harm). The Court will grant Defendants' Motion and deny Dixon's Motion as to the Eighth Amendment claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, construed as a Motion for Summary Judgment, will be GRANTED. Dixon's Motion for Summary Judgment will be DENIED. A separate Order shall issue.

Date: September 10, 2019

THEODORE D. CHUANG
United States District Judge

15